IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern District)

| | | |
|---|---|---|
| BOARD OF EDUCATION OF MONTGOMERY COUNTY<br>850 Hungerford Drive<br>Rockville, Maryland 20850 | *<br>*<br>* | |
| and | * | |
| JERRY D. WEAST, Superintendent MONTGOMERY COUNTY PUBLIC SCHOOLS<br>850 Hungerford Drive<br>Rockville, Maryland 20850 | *<br>* | Case No.: |
| Plaintiffs | *<br>* | |
| v. | * | |
| NATHAN SHARPE, a minor by his parents and next friends, Steven and Susan Sharpe<br>6031 Ridge Drive<br>Bethesda, Maryland 20816 | *<br>* | |
| and | *<br>* | |
| STEVEN AND SUSAN SHARPE<br>6031 Ridge Drive<br>Bethesda, Maryland 20816 | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT**

JURISDICTION

1.      This Court has original jurisdiction pursuant to the Individuals with

Disabilities Improvement Act, 20 U.S.C. §§1400-1461 and 28 U.S.C. §§1331 and 1343.

Declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.  This Court has pendant

1

jurisdiction pursuant to Md. Code Ann., Educational Article, §8-401 et seq. Plaintiffs have exhausted their state administrative remedies and appeal to this Court from a decision of an Administrative Law Judge of the Maryland State Office of Administrative Hearings ("the ALJ") acting on behalf of the Maryland State Department of Education, *Nathan Sharpe. v. Montgomery County Public Schools*, MSDE-MONT-OT-06-45718 (February 28, 2007) ("the ALJ Decision").

## PARTIES

2.  The Board of Education of Montgomery County ("the School Board") is a local educational agency as defined by 20 U.S.C. §1401, which operates the Montgomery County Public Schools ("MPCS").

3.  Nathan Sharpe ("the Student") is a child who resided in Montgomery County, Maryland.

4.  Steven and Susan Sharpe ("the Parents") are the parents of the Student.

## FACTUAL ALLEGATIONS

5.  The Student was born on March 14, 1992, and qualifies for special education services as a child with a code of Other Health Impairment as the result of a diagnosis of Attention Deficit Hyperactivity Disorder.

6.  During the 2000-2001 school year, the Student attended 3rd grade at Bannockburn Elementary School, a public school operated by MCPS.

7.  During the 2000-2001 school year, the Student was home-schooled by the Parents.

8.  From the 2002-2003 school year (5th grade) through the 2005-2006 school year (8th grade), the Student attended, at the Parents' expense, The Lab School of Washington ("The Lab School"), a private special education school, operated in Washington, D.C.

9.  The Student was provided with the related services of speech and language therapy and psychological services while at The Lab School.  The Student made meaningful educational progress at The Lab School and the Student was invited to attend The Lab School for the 2006-2007 school year (9th grade).

10.  On or about August 16, 2004, the Parents filed a request with MCPS for special education services for the Student.

11.  On October 6, 2004, an Individualized Education Plan ("IEP") screening meeting was held for the Student at Thomas W. Pyle Middle School ("TWPMS") at which the parents authorized MCPS to conduct various assessments of the Student.

12.  According to a November 6, 2004 Educational Assessment Report conducted by MCPS, the Student was achieving in the average range in reading, writing and mathematics.

13.  According to a November 16, 2004 Speech/Language Review and Assessment conducted by MCPS, it was indicated that the Students' scores were solidly within the average range, with indicated weaknesses in following complex multi-step directions, paraphrasing and re-telling auditory information,  word retrieval and verbal reasoning skills.  Continued speech/language therapy was recommended.

14.  According to a December 7, 2004 Report of Psychologist conducted by MCPS, the Student demonstrated a decrease in cognitive functioning compared to testing conducted in 1999 and 2000.

However, the validity of the 2004 scores was called into question based upon the Student's unenthused performance. Social and emotional testing indicated significant emotional concerns impacting the Student's performance at school.

15. According to a December 20, 2004, Occupational Therapy Evaluation conducted by MCPS, the Student demonstrated the ability to execute typical motor tasks necessary during the school day, and occupational therapy services were not recommended.

16. An evaluation IEP team meeting was convened on December 22, 2004, to consider the results of the MCPS evaluations. The team determined that the Student continued to be eligible for special education services under a code of Other Health Impaired.

17. The IEP team reconvened on January 19, 2005, at which time it was recommended that the Student attend a special education program offered at TWPMS. The Parents stated that they were not interested in the services offered and elected to keep the Student at The Lab School.

18. On September 12, 2005, the Parents again requested special education services from MCPS. Along with that request, the Parents forwarded a psychotherapy progress report dated March, 2005, which recommended continuing psychotherapy; a Mid-Year Progress Report, dated April, 2005, indicating that the Student was making progress in his special education program at The Lab School; a Final Report, dated June, 2005, which indicated continued progress; a May 17, 2005, IEP for the 2005-2006 school year, which included related services of speech/language therapy and clinical psychology;

and a January, 2005, Speech and Language Report, which recommended continued speech/language therapy services.

19. On October 18, 2005, an IEP team meeting was convened at TWPMS, at which the new information was considered and the Parents authorized updated evaluations and observations of the Student.

20. On November 11, 2005, an MCPS special educator observed the Student at The Lab School.

21. According to a December 7, 2005 Report of Psychologist conducted by MCPS, the Student was demonstrating a far more optimistic and motivated attitude than that demonstrated at the time of the December, 2004, psychological report. The Student was seen as engaging in school tasks with greater responsibility.

22. On December 14, 2005, the IEP team reconvened to review the new information. The Parents expressed their belief that the Student needed to remain at The Lab School and requested that MCPS fund his continued placement there. According to both the Parents and a representative from The Lab School, the Student was doing much better during the 2005-2006 school year at The Lab School than he had done during the 2004-2005 school year. The Lab School representative stated that The Lab School would continue to be an appropriate educational placement for the Student and that he was welcome back for the 2006-2007 school year.

23. On January 11, 2006, the IEP team reconvened and reconfirmed its determination that the Student could be offered a free and appropriate public education in a special education program at TWPMS with related services in speech and language and counseling. The Parents objected to that placement, arguing that the Student was doing

well at The Lab School because of the relationships that he had developed and the flexibility of the program offered there.

24. On April 7, 2006, the Parents filed a Request For Due Process Hearing seeking an order that MCPS place and fund the student at The Lab School, where, according to the Parents, he was receiving educational benefit.

25. On May 10, 2006, the Parents withdrew their hearing request, stating their intent to return to the IEP process for the 2006-2007 school year.  Concurrently, the Parents notified MCPS of their request for a placement other than The Lab School.  The Parents enclosed information regarding an experiential, wilderness-type residential program located in Dubois, Wyoming, called "SOAR."  SOAR is not an accredited special education program, and it does not provide speech language, counseling or psychological services.  The program included a semester in Yellowstone Park, but no officially-recognized curriculum.  High school credits could not be earned at SOAR, and students at SOAR are not provided with an IEP.

26. On June 9, 2006, The Lab School provided the IEP team at TWPMS with an April 2006 Mid-Year Progress Report, indicating that the Student was realizing meaningful educational benefit from his program at The Lab School.

27. The Lab School also provided an IEP dated May 30, 2006, for the 2006-2007 school year at The Lab School.  The IEP recommended that the Student continue at The Lab School and that he continue to receive related services in speech and language therapy and clinical psychology.

28. The Lab School also provided the IEP team with the Student's report card, which indicated that he was achieving primarily A's, B's and C's.

29. According to a March, 2006, Psychotherapy Report from The Lab School, the Student's emotional issues continued to impair his ability to function within the general education curriculum, and it was recommended that he continue to participate in individual psychotherapy for the 2006-2007 school year.

30. As of May, 2006, the parents had decided to place the Student at SOAR for the 2006-2007 school year.

31. According to educational achievement testing performed on May 15, 2006, the Student was achieving at or above average in all academic areas.

32. On June 12, 2006, an IEP team met at TWPMS. The team again found the Student eligible for special education services under a code of Other Health Impaired and recommended that he receive related services in speech/language and counseling. In accordance with the Parents' request, the team determined that the Student would receive 100% of his educational services in a self-contained setting. His IEP goals and objectives were derived primarily from The Lab School IEP and were agreed to by the Parents. The team elected to refer the case to a central IEP team for a placement decision.

33. On August 14, 2006, an MCPS central IEP team convened and recommended the Student's placement at The Bridge Program at Winston Churchill High School ("WCHS"). The team adopted all other provisions of the IEP developed by the TWPMS team that met on June 12, 2006.

34. The Bridge Program serves a diverse population of students with various disabilities and is not a categorical program only for students with Autism or Asperger's Syndrome.

35. The Bridge Program was capable of providing each and every service specified in the Student's August 14, 2006 IEP. The Student would reasonably have been expected to make meaningful educational progress had he attended that program for the 2006-2007 school year. He would have been provided with a free and appropriate public education in the least restrictive environment at The Bridge Program.

36. On September 1, 2006, the Parents forwarded to MCPS the Student's June, 2006, Final Report from The Lab School, which indicated that he had made meaningful educational progress during the 2005-2006 school year.

37. On October 20, 2006, the Parents filed their second Request for Due Process Hearing, this time requesting placement and funding at SOAR.

38. On December 7 and 8, 2006, January 17, 18 and 31, 2007, a hearing was held before an administrative law judge ("ALJ") of the Maryland State Office of Administrative Hearings.

39. On February 28, 2007, the ALJ rendered his decision erroneously ordering the School Board to reimburse the Parents for the cost of the Student's tuition at SOAR for the 2006-2007 school year.

40. The ALJ's decision contained palpable mistakes of law and fact and was contrary to the evidence for reasons including, but not limited to, the following:

    a. The ALJ ordered placement at SOAR for social and emotional conditions that were segrebable from the Student's educational needs.

    b. The ALJ failed to consider the significance of his own finding that the appropriateness of the Student's placement at SOAR had little to do with his academics or grades.

c. The ALJ failed to consider the significance of his own finding that the Student was making academic progress at The Lab School, which was far less restrictive than SOAR and more similar to The Bridge Program at WCHS.

d. The ALJ erroneously concluded that The Bridge Program at WCHS was a categorical program only for students with Autism or Asperger's Syndrome.

e. The ALJ based his decision on the assumption that the Student was entitled to a potential-maximizing education.

f. The ALJ ordered the School Board to fund the Student's placement at SOAR despite the fact that it did not offer an appropriate program in substantial compliance with the IDEIA.

g. The ALJ ordered the School Board to fund the Student's placement at SOAR despite the fact that it was the most restrictive placement possible.

h. The ALJ ordered the School Board to fund the Student's placement at SOAR despite the fact that the Student was provided with no speech/language, psychological or counseling services.

WHEREFORE, the ALJ's decision should be reversed, the Parents' request for due process hearing should be denied and the School Board should be granted its proper costs and expenses.

        Respectfully submitted,

        JEFFREY A. KREW, LLC
        by:


        _____
        Jeffrey A. Krew, Trial Bar # 08856
        4785 Dorsey Hall Drive, Suite 120
        Ellicott City, Maryland 21042
        (301) 621-4900
        Attorney for the Montgomery County
        Public Schools

Dated:

March 26, 2007